UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ELIZABETH M. RYAN, individually and on behalf
of the Estate of Thomas W. Ryan, deceased,

Plaintiff,

-against-

STATEN ISLAND UNIVERSITY HOSPITAL,
GILBERT LEDERMAN, GILBERT LEDERMAN,
M.D., P.C. and PHILIP JAY SILVERMAN,

Defendants.

No. CV 042666

**AMENDED COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiff, Elizabeth M. Ryan, individually and on behalf of the Estate of Thomas

W. Ryan, by her attorneys, Lifflander & Reich LLP, as and for her Amended Complaint

in this action, upon information and belief, alleges as follows:

**PRELIMINARY STATEMENT**

1.      In this case for fraud, medical malpractice and violation of New York

State consumer protection and public health laws, plaintiff's husband, a terminally ill

patient suffering from pancreatic cancer, was lured into useless treatment by aggressive,

false advertising by defendants Staten Island University Hospital, Gilbert Lederman M.D.

and Philip Jay Silverman M.D. Having enticed plaintiff and her husband, with

misrepresentations of, among other things, a "95% success rate" for cancer treatment, to

leave their home in Florida and forego appropriate treatment, defendants subjected

plaintiff's husband to unnecessary and grossly negligent treatment at their Staten Island

facility, wrongfully enriching themselves, shortening plaintiff's husband's life span and

preying upon the plaintiff and her husband at their most vulnerable time.

2.      Thomas W. Ryan, ("decedent") was a 67-year-old retired employee of the

Brooklyn Public Library, when he was diagnosed with pancreatic cancer in October

2001. Pancreatic cancer, according to the National Cancer Institute (NCI), has a mortality rate of almost 100 % within five years of diagnosis with most patients succumbing within one year of diagnosis.  There is no known cure for this disease, which ranks as the fourth leading cause of cancer death in the United States (NCI).[1]  Shortly after receiving his diagnosis, Mr. Ryan, who was living in Florida with his wife, Elizabeth M. Ryan ("plaintiff"), began comprehensive treatment for the disease on or about November 8, 2001, at the H. Lee Moffitt Cancer Center and Research Institute at the University of South Florida, Tampa, ("Moffitt") (one of only 50 NCI designated Comprehensive Cancer Centers in the United States).[2]  Following an exploratory laparotomy, Moffitt physicians determined that Mr. Ryan's pancreatic tumor was inoperable (unresectable) and commenced a course of treatment with multidisciplinary specialists providing systemic chemotherapy and palliative care. Mr. Ryan's tumor responded to his initial rounds of chemotherapy. Evaluation at Moffitt on March 5, 2002 showed that the tumor had not grown or spread and was slightly diminished in size. Further chemotherapy was planned.

3.       While still an out-patient at Moffitt, Mr. Ryan and his family, became aware of extensive radio and print advertisements disseminated in the State of New York by defendants Staten Island University Hospital ("SIUH") and Gilbert Lederman, ("Lederman") promoting "successful" treatment for many forms of cancer through "Body Radiosurgery."

---

[1]   National Cancer Institute, <u>Pancreatic Cancer (PDQ)</u>:  <u>Treatment</u> (3/03/2004) at www.cancer.gov/cancerinfo/pdq/treatment/pancreatic/healthprofessional, at p. 1-2.

[2]   National Cancer Institute, The National Cancer Institute Cancer Centers Program (1/30/2004) at http://cis.nci.gov/fact/1-2.htm, pp. 1-16.

4.     After making inquiry to defendants Lederman and SIUH about their treatment of pancreatic cancer, shortly after January 29, 2002, plaintiff received a letter from them enclosing a multi-media marketing kit, which included, brochures, a video, press clippings, interviews and other information. Defendants stated in their marketing kit (Exhibits "1" through "5" annexed):

> **"There are many reasons that should justifiably entice you and your family to contemplate treatment in our radiation department. You – like many others from throughout the local area, across the United States and in fact around the world – seek care here for good reasons.**
>
> **The rationale is not necessarily convenience. The basis for our treatment is to have a better outcome with a higher quality of life and greater length of life than other methods commonly provide." (Exhibit "1" p. 1-2)**

5.     Defendants in their correspondence to plaintiff and in their marketing kit asserted that  "Body Radiosurgery" at SIUH is:

> **"highly successful in treating selected primary or metastatic cancers**." **(Exhibit "3")**

6.     Among their many false claims of "success" defendants asserted in their marketing kit:

> **"Primary pancreas cancers** (which Mr. Ryan had) **have been treated with a very high rate of success. In fact, over 99 percent of primary pancreas cancers currently have been successfully controlled in the treated area at Staten Island University Hospital with Body Radiosurgery." (Exhibit "2," p. 12)**
>
> **". . . Liver metastases are cancers that have spread to the liver from other primary sites. . . We have a success rate of 95%."**  (ultimately, Mr. Ryan's pancreatic cancer metastasized to his liver) **(Exhibit "2" p. 10)**

7.     Defendants SIUH and Lederman also falsely claimed:

> **"Indeed, the vast majority of cancer treatment at Staten Island University Hospital with Body Radiosurgery—95 percent—is successful." (Exhibit "2" p. 4)**

8.      Defendants SIUH and Lederman in their marketing kit described Body

Radiosurgery as follows:

> **"Body Radiosurgery is totally non-intrusive, certainly less toxic, and
> consumes much less time than other competing modalities of
> treatment for those selected candidates ... Body Radiosurgery
> patients generally are able to immediately continue their normal
> activities." (Exhibit "2" p. 7)**

> **"Body Radiosurgery is not surgery. In fact, the name "radiosurgery"
> is a misnomer. Body Radiosurgery is pinpoint radiation, using
> multiple, finely-contoured beams from many different angles—all
> directed at the cancer, minimizing radiation to normal healthy
> tissue…" (Exhibit "2" p. 2)**

9.      Defendant Lederman personally stated in his video:

> **"We're seeing tremendous results; results in many hopeless cases.
> People who thought there were no chances for them are coming and
> many, many are having chances of, of another break with life**…

> **The final line is: There's a very high success rate, over 90%. While no
> guarantees, it's a very high success rate and avoids the invasion of
> surgery and the toxicity of systemic chemotherapy for many patients."
> (Exhibit "5")**

10.     Believing the information disseminated by defendants was true, and

desperate to find a successful treatment for Mr. Ryan's pancreatic cancer, Mr. Ryan and

his wife (plaintiff) left their home in Florida, halted further treatment and care at Moffitt

and traveled to Staten Island University Hospital in Staten Island, New York on April 30,

2002, seeking the benefits of the "successful" Body Radiosurgery treatment defendants

promoted.

11.     While at defendants' facility for the first time, Mr. and Mrs. Ryan

observed defendants' prominent display of photographs of various celebrities on the

walls of their facility, including several autographed photographs of George Harrison, a

world-famous musician and member of The Beatles, who, they learned from the mass

4

media, had been treated by defendants. The Ryans believed that since George Harrison, who presumably could afford the finest treatment in the world, came to SIUH and Lederman for his medical care, they were in the right place for successful treatment.

12.     The claims of "success" disseminated by defendants, and relied upon by the Ryan's, were not true. They were designed to entice and lure vulnerable and unsuspecting cancer patients and their loved ones, including the Ryans, to undergo their highly-promoted Body Radiosurgery treatment through a pattern of fraudulent business practices and acts, including false, misleading and deceptive advertising, designed to generate income for defendants SIUH and Lederman at the expense of patients and their families.

13.     Defendants by their fraudulent, false, misleading and deceptive advertising sold false hope to desperate cancer patients and their loved ones, including the Ryans, in order to unjustly enrich themselves at the expense of vulnerable patients, their families and the public.

14.     Mr. Ryan was evaluated and treated by defendants with Body Radiosurgery for his pancreatic cancer from April 30, 2002 until June 22, 2002. He was treated by defendants for metastatic cancer to his liver from June 25, 2002 to September 12, 2002. He died on October 2, 2002 and was buried in Queens, New York.

15.     Unknown to plaintiff, her husband and their adult children, the claims of successful cancer treatment at SIUH by Body Radiosurgery disseminated by defendants SIUH and Lederman in New York by mail, radio and the internet were not derived or supported by generally accepted scientific methodology or evidence in the professional

oncology and medical community, nor were they accepted by the professional community of oncology and medicine, and defendants knew it.

16.     Further unknown to plaintiff, decedent and their family, defendants SIUH and Lederman lacked data derived by generally accepted scientific methodology and/or evidence that Body Radiosurgery at SIUH prolonged the life of pancreatic cancer patients or increased their quality of life. Nor did the professional literature in oncology and medicine support the assertion that Body Radiosurgery prolonged the life of pancreatic cancer patients or increased their quality of life.

17.     Still further unknown to plaintiff, decedent and their family, defendants' representations that Body Radiosurgery at SIUH had minimal side effects were false, misleading and deceptive.

18.     Common to radiation therapy, including Body Radiosurgery, is the potential for adverse effects to adjacent surrounding tissues and organs, including, but not limited to radiation burns, physical and mental debilitation and the real risk of other significant health impairing and life threatening complications, including death. Since decedent suffered from diabetes, he had a significantly increased risk of adverse radiation effect causing irreparable harm.

19.     Defendants' false and fraudulent claims of treatment success by Body Radiosurgery with minimal side effects were actually an integral part of a marketing scheme designed to compete with other hospitals and physicians and increase patient share and hospital and physician revenues:

> **"In radio spots running on four of New York's most popular station, this feisty community hospital is pushing services like stereotactic radio surgery …"The idea is to draw the patients who used to go off the island for things like this," says Rick Varone, president of the hospital.**

> **…Staten Island University Hospital is spending heavily to promote programs like its cancer center, perhaps in the six figures, according to some experts. Hospital executives say it's a matter of survival. "We have to do everything we can to position ourselves to use the beds and facilities we have," says Ralph Lamberti, senior vice president [at SIUH]. 'They call it survival.'" *Crains New York Business*, Page 34, (February 27, 1995) (Exhibit "6")**

### Medicaid Fraud by Staten Island University Hospital

20.     Further unknown to plaintiff, Mr. Ryan (decedent) and his children, SIUH had a history of placing its financial interest ahead of the interests of its vulnerable patients and the people of the State of New York. In September 1999, New York State Attorney General Elliot Spitzer announced that his Medicaid Fraud Control Unit had uncovered that SIUH had substantially overbilled the New York State Medicaid program for services it allegedly provided to developmentally disabled residents living in adult homes and group residences.

> **In addition to the billing problems, investigators found that the services allegedly provided by the hospital were unsupported by evidence of genuine necessity (Press Release, Office of New York State Attorney General Eliot Spitzer, September 22, 1999). ("Exhibit "7")**

21.     Rather than contest the civil charges SIUH agreed to settle New York's claim by reimbursing the State Forty Five Million ($45,000,000) Dollars and providing an additional Thirty Nine Million ($39,000,000) Dollars in uncompensated and/or free services to indigent patients over 20 years without admitting guilt. The Counsel for the National Association of Medicaid Fraud Control Units, Barbara Zellner stated:

> **The settlement between the Attorney General's Office and Staten Island University Hospital is, I believe, the largest monetary settlement between a health care provider and a state. While many health care settlements require the establishment of a compliance program, this is the first time that a state Medicaid Fraud Control Unit is imposing an outside monitor to review the future conduct of a hospital (Press Release, Office of New York State Attorney General Eliot Spitzer, September 22, 1999). (Exhibit "7")**

## Exploitation of George Harrison by Lederman

22.     Further unknown to plaintiff, Mr. Ryan and their children, defendant Lederman had a history of placing his interests ahead of those of his vulnerable patients. For example, prior to and subsequent to November 14, 2001, Lederman disseminated to news agencies, magazines and television confidential information he had obtained in a professional capacity about his patient, widely reported in the media to be the late George Harrison, without his patient's consent. Lederman received free publicity for himself and his medical practice at the expense of his famous patient.

23.     Lederman did not contest that his actions constituted professional misconduct as defined by N.Y. Education Law Sec. 6530(23) and he was Censured and Reprimanded on November 25, 2003 by the New York State Department of Health State Board for Professional Medical Conduct (OPMC) pursuant to New York Public Health Law Sec. 230-a(1) and  fined $5,000 (Exhibit "8").

## Damages to Plaintiffs and the Public

24.     Plaintiffs now seek compensatory and punitive damages for bodily, psychological and financial injuries suffered as a result of:  defendants' fraudulent and deceptive business practices, including false and misleading advertising, which enticed and lured Mr. Ryan into unnecessary, inappropriate, unsuccessful treatment causing the Ryans financial harm, depriving Mr. Ryan of the opportunity to receive necessary and appropriate treatment and care that was available to him close to his home and friends, shortening his remaining life span, and taking from Mr. Ryan and his wife the choice of how to enjoy Mr. Ryan's final months of life and his choice of where, and under what circumstances he would die,  all in violation of New York's consumer protection statutes, General Business Law Sections 349 and 350 (G.B.L.); defendants' fraudulent conduct

which enabled their unjust enrichment at the expense of the Ryans, as well as other cancer patients and their families; defendants' medical negligence in repeatedly administering radiation to Mr. Ryan for his pancreatic cancer with liver metastases which was not medically justified and their failure to provide or refer Mr. Ryan for medical care and treatment which was necessary and justified; their failure to obtain informed consent from Mr. Ryan prior to repeatedly providing Body Radiosurgery as required by  New York Public Health Law 2805-d; their failure to treat Mr. Ryan's symptoms, severe pain and suffering and worsening condition caused in part by defendants' treatment. Defendant's medical negligence deprived Mr. Ryan of the chance to receive appropriate treatment and care with a real probability of increasing his length of survival and the vital quality and enjoyment of his remaining life, loss of the opportunity to choose how to live his final days, and cut short his remaining life span.

25.     This action is further brought pursuant to G.B.L. Sections 349 and 350 since defendants deceptive business practices, acts and false advertising have in the past harmed and may in the future continue to harm cancer patients and their loved ones, as well as caring and honest physicians and hospitals in this State that offer appropriate treatment.

## PARTIES

26.     Plaintiff Elizabeth M. Ryan is a citizen of the State of Florida and is domiciled in Spring Hill, Florida. She is the Representative of the Estate of Thomas W. Ryan, who at the time of his death in October 2002, was a citizen of the State of Florida and domiciled in Spring Hill, Florida. Letters of Administration were issued to Elizabeth

M Ryan, on or about April 26 2004, by the Circuit Court for Hernando County, Florida, Probate Division.

27.     Defendant Staten Island University Hospital ("SIUH") was and is a domestic corporation incorporated under the laws of the State of New York having its principal place of business at 475 Seaview Avenue Staten Island, New York 10305.

28.     Defendant Gilbert Lederman ("Lederman") is a citizen of the State of New York residing at 304 Douglas Road, Staten Island, New York 10304.  At the time of the events complained of herein, he was the Director of Radiation Oncology for defendant SIUH.

29.     Defendant Gilbert Lederman, M.D. P.C. ("Lederman P.C".) was and is a professional corporation duly incorporated in the State of New York, having its principal place of business at 227 East 19th Street, New York, New York 10003.

30.     Defendant Philip Jay Silverman, ("Silverman") is a citizen of the State of New York residing at 475 Seaview Avenue, Staten Island, New York 10305. At the time of the events complained of herein and currently he is an attending physician practicing in the Department of Radiation Oncology at SIUH.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. Section 1332 because there is a diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

32.     Venue is appropriate in this District as all the Defendants reside in this District and the majority of events giving rise to the claims asserted herein occurred in this district.

## FACTUAL BACKGROUND

33.     At all times mentioned herein, defendant SIUH owned, managed, operated and controlled the aforementioned named facility for the purpose of rendering medical care, assistance and treatment to the general public.

34.     SIUH used and employed physicians, staff members, nurses, technicians, servants, employees and personnel who were authorized, supervised, controlled and directed by defendant SIUH to render medical care, treatment, services, evaluation and assistance at SIUH facilities.

35.     SIUH did undertake and rendered medical care and treatment to plaintiff's decedent.

36.     SIUH and its agents, servants and employees did undertake and rendered medical care, services, diagnoses and treatment to plaintiff's decedent on or about April 30, 2002 through October 2002.

37.     Defendant Lederman was and is a physician duly licensed to practice medicine and surgery in the State of New York.

38.     Defendant Lederman was a principal in and practiced medicine with Lederman P.C.

39.     Defendant Lederman was an officer of defendant Lederman P.C.

40.     Defendant Lederman was an employee of defendant Lederman P.C.

41.     At all times mentioned herein, Lederman and /or Lederman P.C. was an agent, servant and/or employee of defendant SIUH.

42.     At all times mentioned herein, Lederman and /or Lederman P.C. was a partner of defendant SIUH.

43.     At all times mentioned herein, Lederman and/or Lederman P.C. engaged in a joint venture with defendant SIUH.

44.     Lederman and/or Lederman P.C. did undertake and rendered medical care and treatment to plaintiff's decedent.

45.     Lederman and/ or Lederman P.C. and their agents, servants and employees did undertake and rendered medical care, services, diagnoses and treatment to plaintiff's decedent on or about April 30, 2002 through October 2002.

46.     At all times mentioned herein, defendant Silverman was a physician duly licensed to practice medicine and surgery in the State of New York

47.     At all times mentioned herein, Silverman was an agent, servant and/or employee of defendant SIUH.

48.     At all times mentioned herein, Silverman was an agent, servant and/or employee of defendant Lederman and/or Lederman P.C.

49.     At all times mentioned herein, Silverman was a partner of defendant Lederman and/or Lederman P.C. (hereinafter collectively denoted "Lederman").

50.     At all times mentioned herein, Silverman was a partner of defendant SIUH.

51.     At all times mentioned herein, Silverman engaged in a joint venture with defendant SIUH.

52.     At all times mentioned herein, Silverman did undertake and rendered medical care and treatment to plaintiff's decedent.

53.     At all times mentioned herein, Silverman and his agents, servants and employees did undertake and rendered medical care, services, diagnoses and treatment to plaintiff's decedent on or about April 30, 2002 through October 2002

### Deceptive Business Practices, Acts, False and Fraudulent Advertising

54.     Since at least 1997 through and including 2002, defendants SIUH and Lederman, individually and acting in concert, engaged in the marketing, advertising, promoting and selling of Body Radiosurgery, a purported treatment to successfully treat many types of cancer with minimal side effects

55.     Since at least 1997 through and including 2002, defendants SIUH and Lederman, individually, and acting in concert, disseminated or caused to be disseminated from New York State to consumers within New York and outside the State through extensive radio advertising, mail, print advertisements, informational brochures, videos, internet advertising, seminars, consultations, media interviews and articles, claims that they offered successful treatment at SIUH for many forms of cancer by Body Radiosurgery with minimal side effects, and that defendants had the greatest expertise and experience in the western hemisphere, and possibly worldwide.

56.     Defendants SIUH, Lederman and Silverman, individually and acting in concert, lured and enticed cancer patients and their families into "informational" seminars and personal consultations at SIUH wherein defendants disseminated to them false, deceptive and misleading information regarding the nature, benefits, risks and alternatives to Body Radiosurgery at SIUH.

57.     That the information disseminated or caused to be disseminated by defendants SIUH, Lederman and Silverman from New York State to consumers within

the State and outside the State regarding Body Radiosurgery at SIUH contained material

misrepresentations of fact and material omissions of fact that had the effect of misleading

and deceiving members of the public within and outside New York State.

58.     As a consequence of defendants SIUH, Lederman and Silverman's multi-

media promotion in New York State of Body Radiosurgery at SIUH, including their

claims of successful treatment of various forms of cancer with minimal side effects,

numerous New York State consumers and others were deceived and mislead by

defendants.

59.     As a consequence of defendants SIUH, Lederman and Silverman's multi-

media dissemination in New York State of their claims of successful treatment of various

forms of cancer with minimal side effects numerous New York State consumers, in

reliance upon defendants' claims, were treated by defendants with Body Radiosurgery for

many forms of cancer.

60.     As a consequence of defendants SIUH, Lederman and Silverman multi-

media promotion in New York State of Body Radiosurgery at SIUH, including their

claims of successful treatment of various forms of cancer with minimal side effects,

numerous cancer patients and their families outside the State of New York were deceived

and mislead by defendants.

61.     As a consequence of defendants SIUH Lederman and Silverman multi-

media dissemination in New York State and outside the State of their claims of successful

treatment of many forms of cancer with minimal side effects, many cancer patients and

their families were enticed and lured into New York State, in reliance upon defendants'

claims, and were treated by defendants with Body Radiosurgery for many forms of cancer.

62.     That as a result of defendants SIUH, Lederman and Silverman's aforementioned conduct, many New York cancer patients, and cancer patients and their families who were lured into New York, sustained injuries and damages in New York, including, bodily, psychological, and monetary injuries, loss of the opportunity to receive appropriate treatment increasing the probability of length of survival with a greater quality of life, loss of the opportunity to receive systematic palliative care, pain and suffering, loss of enjoyment of life, and loss of the right to choose how to live their final time together.

63.     That as a result of defendants SIUH, Lederman and Silverman's aforementioned deceptive business practices, acts and false advertising, many New York State and other hospitals and physicians have suffered economic loss and harm since cancer patients who would otherwise obtain treatment from those legitimate facilities and physicians who disseminated truthful and accurate information have been competitively disadvantaged by defendants' fraudulent, false and misleading claims.

64.     Defendants have been unjustly enriched as a result of their aforementioned deceptive business practices, acts and false advertising.

65.     On or about October 2001 through January 2002, plaintiff's daughter, Beth Ryan and her son, Thomas Ryan, Jr. read information about pancreatic cancer, including its treatment and patient prognosis disseminated on various web sites on the Internet, World Wide Web, including, but not limited to, those of NCI (www. cancer.gov), Moffitt (www.moffitt.usf.edu); Memorial Sloan Kettering Cancer Center

(www.mskcc.org); Johns Hopkins Cancer Center

(www.hopkinskimmelcancercenter.org), Dana-Farber Cancer Institute

(dfci.Harvard.edu;) Pancreatic Cancer Action Network (www.pancan.org); and The

Lustgarten Foundation for Pancreatic Cancer Research (www.lustgarten.org).

66.     Beth and Thomas Ryan Jr. did not read any information disseminated on

these aforementioned web sites (at paragraph "65" above) that stated or implied that any

physician, hospital or health facility had a "successful treatment" for pancreatic cancer.

67.     On or about January 29, 2002, in response to Mrs. Ryan's inquiry,

defendants SIUH and Lederman disseminated from the State of New York by mail to

Mrs. Ryan and her husband a multi-media marketing kit and correspondence detailing

supposedly "highly successful treatment" of many forms of cancer by defendants with

minimal side effects using Body Radiosurgery (annexed hereto as Exhibits "1" –"5")

68.     On or about February 2002, plaintiff and decedent read each and every

correspondence, brochure, press clipping, interview and other information contained in

the marketing kit ("Exhibits "1"-"5") and watched the video disseminated by defendants

SIUH and Lederman.

69.     On or about February 2002, plaintiff and decedent read information

disseminated from New York at defendant SIUH Internet web site

(www.siuh.edu/radoncolgy/bodyrad.html) further detailing highly successful treatment

by defendants of many forms of cancer, including pancreatic cancer. ( See annexed

Exhibit "9")

70.     On or about February-March 2002, Beth Ryan, a New York State citizen, read the information disseminated by defendants SIUH and Lederman in their aforementioned marketing kit and viewed the video contained therein.

71.     On or about February-March 2002, Thomas Ryan, Jr. read the information disseminated from New York at defendant SIUH Internet web site detailing highly "successful treatment" by defendants of many forms of cancer, including pancreatic cancer. (See annexed Exhibit "9")

72.     On or about February-March 2002, Thomas Ryan, Jr. read the information disseminated by defendants SIUH and Lederman in their aforementioned multi-media marketing kit (Exhibits "1"-"5") and viewed the video contained therein.

73.     Since at least 1995 and continuing through March 2002, Thomas Ryan Jr. heard radio advertisements broadcast on New York radio stations, including WFAN (660 AM), while driving to work in New York and promoting defendants SIUH and Lederman's "successful" treatment by Body Radiosurgery of many forms of cancer.

74.     Thomas Ryan. Jr. heard information disseminated over the radio that the late George Harrison had been treated by defendants SIUH and Lederman

75.     During the months of February, March and April 2002, plaintiff, decedent, Beth Ryan and Thomas Ryan Jr. repeatedly discussed the representations and information disseminated by defendants SIUH.and Lederman.

76.     On or about March 25, 2002, Thomas Ryan Jr. consulted with defendants Silverman  and SIUH regarding proposed treatment of his father's (decedent's) pancreatic cancer, having been enticed and lured into the consultation as a result of

17

defendants SIUH and Lederman's multi-media promotion of Body Radiosurgery at SIUH.

77.     In the consultation Silverman represented that defendants could successfully treat decedent's pancreatic cancer. In response to questioning regarding whether Body Radiosurgery would prolong his father's life, Silverman represented to Mr. Ryan Jr., in sum and substance that he couldn't say whether the treatment would give his father one (1) year of survival or ten (10) years of survival but that he would have a "good quality of life" after undergoing Body Radiosurgery performed by defendants.

78.     Silverman further represented to Thomas Ryan Jr. that there were minimal side effects with Body Radiosurgery, that it was like "a sun burn," and that many people from all over the world had come to defendants SIUH and Lederman to receive the revolutionary Body Radiosurgery that successfully treated many types of cancer.

79.     That the aforesaid representations by Silverman to Thomas Ryan Jr. were false, misleading and deceptive in that Silverman made material misrepresentations of fact and omitted material information to Mr. Ryan regarding the benefits, risks, and alternatives of Body Radiosurgery treatment for pancreatic cancer at SIUH.

80.     Silverman disseminated false, misleading and deceptive information to Thomas Ryan Jr. to induce and lure his father to undergo Body Radiosurgery for pancreatic cancer performed by defendants.

81.     At the meeting between Thomas Ryan Jr. and Silverman, Mr. Ryan observed various autographed photographs of celebrities prominently displayed, including those of George Harrison, as well as framed testimonial letters.

82.     Following his meeting with Silverman, Thomas Ryan Jr. spoke with his parents (plaintiff and decedent), and sister Beth, and the Ryans (plaintiff, decedent, Beth and Thomas Jr.) agreed based upon their review of the information disseminated by defendants, in their multi-media marketing kit, the internet, radio advertisements and the Silverman meeting, that decedent should stop his treatment at Moffit, travel to New York and undergo Body Radiosurgery with defendants.

83.     The information disseminated or caused to be disseminated by defendants SIUH, Lederman and Silverman from New York State to plaintiff, decedent, Thomas Ryan Jr. and Beth Ryan regarding Body Radiosurgery at SIUH contained material misrepresentations of fact and material omissions of fact that had the effect of misleading and deceiving each of them.

84.     As a consequence of defendants SIUH, Lederman and Silverman's multi-media promotion in New York State of Body Radiosurgery at SIUH, including their claims of successful treatment of various forms of cancer, including pancreatic cancer with minimal side effects, and that defendants had great expertise in administering cancer treatment, plaintiff, decedent, Thomas Ryan Jr. and Beth Ryan were deceived and mislead by defendants.

85.     As a consequence of defendants SIUH, Lederman and Silverman's multi-media dissemination in New York State of their claims of successful treatment of many forms of cancer, including pancreatic cancer and liver metastases with minimal side effects plaintiff and decedent were enticed and lured into New York State having relied upon defendants' false, misleading and deceptive representations and decedent was treated by defendants with Body Radiosurgery.

86.     Defendants SIUH, Lederman and Silverman enticed, lured  and induced plaintiff and plaintiff's decedent through their dissemination of their multi-media marketing kit and the information contained therein, their internet advertising, radio advertisements, use of George Harrison, and the meeting held with Thomas Ryan Jr. at SIUH, to leave their home in Florida, halt treatment at Moffitt, travel to New York and undergo Body Radiosurgery with defendants.

87.     Defendants lured Mr. And Mrs. Ryan into New York State for Body Radiosurgery evaluation and treatment based upon their dissemination of false, misleading and deceptive information regarding the nature and effects of their Body Radiosurgery treatment, their claims of successful cancer treatment, including pancreatic cancer and liver metastases, and their alleged expertise.

### Medical Negligence

88.     On April 30, 2002, plaintiff and decedent traveled to SIUH and Lederman for evaluation and treatment by Body Radiosurgery for Mr. Ryan's pancreatic cancer.

89.     On or about April 30, 2002, decedent was negligently evaluated by defendants Silverman, Lederman and SIUH for a course of Body Radiosurgery for his pancreatic cancer.

90.     Prior to April 30, 2002, "a multi-disciplinary panel of expert physicians," as alleged in defendants' multi-media kit, did not examine decedent's CT scans and clinical history.

91.     Prior to April 30, 2002, "a multi-disciplinary panel of expert physicians," as alleged in defendants' multi-media kit, negligently, carelessly and recklessly examined decedent's diagnostic films, CT scans and clinical history.

92.     Prior to commencing treatment for decedent's pancreatic cancer, defendants SIUH, Lederman and Silverman failed to obtain informed consent from decedent in that defendants failed to provide decedent with material information regarding the benefits risks and alternatives regarding the proposed radiation treatment of his pancreatic cancer, and provided false, misleading and deceptive information regarding the benefits, risks and alternatives to the proposed Body Radiosurgery treatment.

93.     Although SIUH and Lederman advertised the availability of housing close to SIUH where patients and their families could reside over the course of treatment, there was no available opening for decedent and plaintiff.

94.     Decedent and plaintiff rented an apartment in New Jersey and commuted to defendants' facility for each treatment.

95.     Defendants negligently, carelessly and recklessly delayed commencing treatment for decedent's pancreatic cancer from April 30, 2002 through May 25, 2002.

96.     Decedent's pancreatic cancer metastasized to his liver prior to defendants beginning Body Radiosurgery to his pancreas.

97.     Defendants negligently, carelessly and recklessly failed to diagnose decedent's pancreatic cancer with liver metastases prior to initiating Body Radiosurgery treatment to decedent on or about May 25, 2002.

98.     Immediately prior to commencing Body Radiosurgery treatments to decedent on or about May 25, 2002, defendants negligently, carelessly and recklessly failed to perform an evaluation by CT scan or other diagnostic procedure to ascertain whether the pancreatic cancer had metastasized to his liver.

99.    On or about May 25, 2002 to June 22, 2002, defendants SIUH, Lederman and Silverman administered radiation to decedent's pancreas through Body Radiosurgery over 5 days at SIUH.

100.    Defendants knew or should have known on or about May 29, 2002, that decedent's pancreatic cancer had metastasized to his liver.

101.    Defendants knew that their administration of radiation with Body Radiosurgery for decedent's pancreatic cancer was not medically justified, inappropriate, unnecessary and futile.

102.    Defendants' administration of radiation with Body Radiosurgery for decedent's pancreatic cancer was negligent, careless and reckless and was not medically justified, inappropriate, unnecessary and futile.

103.    Defendant's administration of radiation to decedent's pancreas was invasive, negligent, careless and reckless.

104.    Defendants' administration of radiation by Body Radiosurgery for decedent's pancreatic cancer with liver metastases was negligent, careless and reckless and was medically not justified, inappropriate, unnecessary and futile.

105.    Decedent became severely ill with an increasing severity after each administration of radiation by Body Radiosurgery, and suffered increased fatigue, weakness, nausea, vomiting, loss of appetite, pain, bowel problems, psychological symptoms, and sequalae.

106.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly failed to appropriately treat decedent's pain and symptoms following their administration of radiation by Body Radiosurgery to decedent.

107.    During the course of decedent's Body Radiosurgery at SIUH from May 25, 2002 to June 10, 2002, defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly failed to perform an evaluation by CT scan or other diagnostic procedure to ascertain whether decedent's pancreatic tumor had metastasized.

108.    During the course of decedent's Body Radiosurgery at SIUH from May 25, 2002 to June 22, 2002, defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly failed to perform an evaluation by CT scan or other diagnostic procedure to ascertain whether the pancreatic tumor was controlled.

109.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly failed to control decedent's pancreatic cancer.

110.    Decedent's family informed defendants SIUH, Lederman and Silverman during the course of Body Radiosurgery that the pancreatic tumor had metastasized to decedent's liver since defendants SIUH, Lederman and Silverman had failed to detect the liver metastases.

111.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly failed to treat decedent's liver metastases appropriately and in a timely manner thereby allowing decedent to experience increasing pain and suffering and futile radiation treatment with Body Radiosurgery

112.    On or about June 25, 2002 defendants SIUH, Lederman and Silverman began radiation treatment for decedent's liver metastases with Body Radiosurgery.

113.    Prior to commencing treatment for decedent's liver metastases, defendants SIUH, Lederman and Silverman failed to obtain informed consent from decedent in that defendants failed to provide decedent with material information regarding the benefits

23

risks and alternatives regarding the proposed radiation treatment of his liver metastases and provided false, misleading and deceptive information regarding the benefits, risks and alternatives of the proposed treatment.

114.   Defendants, SIUH, Lederman and Silverman negligently, carelessly and recklessly evaluated decedent's liver metastases and devised and administered a treatment plan for Body Radiosurgery of <u>only four of decedent's metastatic liver lesions</u>, having full knowledge that other lesions were present in his liver.

115.   Defendants knew that the plan they devised and implemented for Body Radiosurgery of decedent's liver metastases was not medically justified, was contraindicated and would result in futile treatment.

116.   Defendants, SIUH, Lederman and Silverman negligently, carelessly and recklessly exposed decedent to excessive radiation in treating his liver metastases by Body Radiosurgery and other procedures, including whole liver radiation.

117.   As a result of defendants' negligence, carelessness and recklessness in exposing decedent to excessive radiation, decedent suffered pain, weakness, fatigue, loss of appetite, dehydration, loss of quality of life, bowel problems, physical and psychological deterioration and death.

118.   Defendants' negligent, careless and reckless conduct shortened decedent's remaining life span.

119.   Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly failed to provide decedent with necessary and appropriate cancer care and treatment, including, but not limited to, systemic chemotherapy, palliative care of his symptoms, physical and psychological, during the course of their treatment of decedent.

24

120.    Decedent was required to obtain emergency palliative care at Monmouth Medical Center as a result of defendants SIUH, Lederman and Silverman's negligent, careless and reckless failure to provide him with necessary and appropriate cancer care and treatment.

121.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly failed to offer or refer decedent to necessary and appropriate cancer care specialists in oncology, internal medicine, surgery and palliative care.

122.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly failed to offer or refer decedent for necessary and appropriate cancer care and treatment, including, but not limited to, systemic chemotherapy, and systematic palliative care of his symptoms, both physical and psychological.

123.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly provided decedent with unnecessary, invasive and inappropriate treatment, including Body Radiosurgery, for his pancreatic cancer

124.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly provided decedent with invasive, unnecessary and inappropriate treatment, including Body Radiosurgery, for his liver metastases

125.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly provided decedent with invasive, unnecessary and inappropriate treatment, including Body Radiosurgery, for his pancreatic cancer with liver metastases,

126.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly provided decedent with invasive, unnecessary and inappropriate Body Radiosurgery and whole liver radiation for his liver metastases.

127.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly deprived decedent of the opportunity to obtain necessary and appropriate medical care and treatment for his pancreatic cancer, including, but not limited to, systemic chemotherapy and systematic palliative care.

128.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly deprived decedent of the opportunity to obtain necessary and appropriate medical care and treatment for his liver metastases, including, but not limited to, systemic chemotherapy and systematic palliative care.

129.    Defendants SIUH, Lederman and Silverman negligently, carelessly and recklessly deprived decedent of the opportunity to obtain necessary and appropriate medical care and treatment for his pancreatic cancer with liver metastases, including, but not limited to, systemic chemotherapy and systematic palliative care.

## AS AND FOR A FIRST CAUSE OF ACTION
## AGAINST DEFENDANTS
### (Violation New York State G.B.L. Secs. 349 and 350 )

130.    Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 129 of the complaint as if set forth fully herein.

131.    Defendants SIUH, Lederman and Silverman, individually, and acting in concert, disseminated or caused to be disseminated to plaintiff and decedent and their family, as well as cancer patients and their families in the State of New York and outside the State, in their media kit (annexed hereto as Exhibits "1"-"5") and over the internet (annexed hereto as Exhibit 9), in seminars, consultations, and radio advertising numerous representations which were false, deceptive and misleading containing material misrepresentations of fact and material omissions of fact read singularly and/or

collectively.  The following are examples of defendants SIUH's and Lederman's

deceptive and misleading representations, contained in their multi-media kit and their

website.

### False Claims of Success

132.    Defendants SIUH and Lederman expressly represented by the following

statements, when read individually or collectively, that they can "successfully" and

"effectively" treat many forms of cancer, including pancreatic cancer and liver

metastases, which decedent suffered from:

**a.      "The basis for our treatment is to have a better outcome with a higher quality of life and greater length of life than other methods commonly provide." (Exhibit "1," p. 1-2)**

**b.      "(Body Radiosurgery) is a non-invasive technique that is highly successful in treating selected primary or metastatic cancers." (Exhibit "3")**

**c.      "The vast majority of cancer treatment at Staten Island University Hospital with Body Radiosurgery—95 percent—is successful." (Exhibit "2," p. 4)[3]**

**d.      "Primary pancreas cancers** (which decedent suffered from) **have been treated with a very high rate of success. In fact, over 99 percent of primary pancreas cancers currently have been successfully controlled in the treated area at Staten Island University Hospital with Body Radiosurgery." (Exhibit "2," p. 12)**

**e.      "We have recently analyzed Body Radiosurgery in comparison to infusion of radioactive P32 and found Body Radiosurgery superior. We had no local failures compared to a local failure rate of 29 percent with P32 infusion into the pancreas cancer. Furthermore, the size of the cancers treated with Body Radiosurgery were-on average- three times the size and still we had a dramatically higher success rate.**

**This should speak to the power of Body Radiosurgery for pancreas, and indeed many primary and metastatic cancers even located in delicate parts of the body." (Exhibit "2," p. 12)**

**f.      Lederman states on video:  "This new treatment is non-invasive, highly successful and offers great hope to those who previously thought there was none."  (Exhibit "5")**

---

[3]   All representations made by defendants SIUH and Lederman contained in Exhibit "2" herein are also contained in SIUH's website, contained herein at Exhibit "9," "Fractionated Stereotactic Body Radiosurgery, An Innovative and Effective New Treatment Method."

g.      **"Liver metastases are cancers that have spread to the liver from other primary sites. Primary cancers in this category include those from lung, breast, <u>pancreas</u>** (ultimately, decedent's pancreatic cancer metastasized to his liver) (emphasis added)**, gall bladder, melanoma, sarcoma and colon, among others and have been treated using Body Radiosurgery. We have a success rate of 95 percent." (Exhibit "2," p. 10)**

h.      **"Primary liver cancers, like hepatomas, pancreatic cancers** (which decedent suffered from) **and lung cancers are frequently suitable for Body radiosurgery. Other cancers too numerous to list, have been successfully treated with Body Radiosurgery at SIUH." (Exhibit "2," p. 4)**

i.      **"Of the overwhelming number of patients we have treated, well over 90% have had successful outcomes of their fractionated body radiosurgery." (Exhibit "4a")**

j.      **"In the abdominal cavity we treat primary and metastatic cancers. Abdominal cancers range the gamut from colon, germ cell, melanoma, ovarian, thyroid, kidney, pancreas, sarcoma and others. Size range is broad from the very small to the very large, with the overwhelming majority of cancers showing cessation of growth, shrinkage or complete disappearance." (Exhibit "2," p. 13)**

k.      **"Each case, of course is unique, but a vast array of types of cancers – including adenocarcinomas, squamous carcinomas, lung cancers, breast cancer, germ cell tumors, primary liver tumors, pancreas tumors** (which decedent suffered from)**, colon cancers, sarcomas, melanomas, renal cell, metastatic and primary head and neck cancers, and others – have been successfully treated and are included in ongoing data evaluation." (Exhibit "2," p. 8)**

l.      Lederman states on video: **"We're seeing tremendous results; results in many hopeless cases. People who thought there were no chances for them are coming and many, many are having chances of, of another break with life."**

**The final line is: There's a very high success rate, over 90%. While no guarantees, it's a very high success rate and avoids the invasion of surgery and the toxicity of systemic chemotherapy for many patients." (Exhibit "5")**

m.      **"Dr. K (Dr. Kornhauser): Are there statistics available with this program?**

**Lederman: Yes.  Of the overwhelming number of patients we have treated, well over 90% have had successful outcome of their fractionated body radiosurgery." (Exhibit "4a").**

n.      **"Imagine a new world where radiation can be delivered directly to the cancer with pinpoint precision minimizing effects on healthy, normal tissues, and thereby maximizing the radiation dose the cancer receives … yielding better outcome and possibilities never dreamed before."**

**"Such is the world of Body Radiosurgery at Staten Island University Hospital – the**

first hospital in the Western hemisphere to perform pinpoint Body Radiosurgery. It is a new world that opens many doors and options for the patient with cancer and their family." (Exhibit "2," p. 1-2)

o.    "Results are superior for many tumors – benign and malignant – with better maintenance of function, fewer complications and lesser need for subsequent intervention, in general." (Exhibit "2," p. 2)

p.    "Staten Island University Hospital has expanded Body Radiosurgery to become an attractive, highly successful program for primary and metastatic cancers." (Exhibit "2," p. 2)

q.    "It is a technique (Body Radiosurgery) which we are most comfortable and perform repeatedly every day and every night for patients who come from around the country and throughout the world." (Exhibit "2," p. 6)

r.    "Body Radiosurgery can be implemented in those patients who desire a non-invasive treatment alternative that has great effectiveness in selected situations." (Exhibit "2," p. 2)

s.    "The vast majority of cancers treated at SIUH  (primary as well as metastatic) are treated successfully in the targeted area – meaning cessation of growth, shrinkage or disappearance of cancer."(Exhibit "2," p. 4)

t.    "Currently, 37 percent of patients treated had cancers in the lung, with 45 percent of those being primary lung cancers, and 55 percent metastatic cancers to the lung. Another large category includes liver cancers, with 90 percent being metastases, and 10 percent primary liver cancers.

Often, but not always, our patients come to us after being heavily pretreated with chemotherapy, surgery and radiation. Yet 88 percent of the patients treated at our Radiosurgery center with Body Radiosurgery are alive one year after our treatment was initiated. Many patients were so called 'hopeless cases' before coming to SIUH." (Exhibit "2," p. 9)

u.    "Data collected with thousands of procedures being performed, continue to show marked efficacy for treating primary and metastatic tumors. Frequently these cancers were considered to be untreatable by other modalities or to have treatment approaches that were less promising." (Exhibit "2," p. 8)

v.    "Studies have shown the effectiveness of Body Radiosurgery in treating both primary as well as metastases. The appeal of radiosurgery is that very high doses of radiation are precisely delivered with minimal effects to normal healthy tissues. We update our data regularly and track each case to have a complete record of Body Radiosurgery. This is important for our academic work and for patients and their families to be able to possess as much information as possible before making such a crucial decision about one's medical care." (Exhibit "2," p. 14)

w.    "Dr. Kornhauser: What are your statistics at SIUH for body radiosurgery?

29

**Dr. Lederman:** Thus far, all tumors treated have been successfully controlled-meaning cessation of growth, shrinkage or disappearance." (Exhibit "9," Lederman-Kornhauser, p. 5)

  x. "**Dr. Kornhauser:** What is the data showing the benefit of body radiosurgery?

**Dr. Lederman:** Currently reported data of metastases treated shows a control rate of 94.5% ... Primary tumors including the lung liver and pancreas as well as other sites were indeed treated with generally good success using body radiosurgery." (Exhibit "9," Lederman-Kornhauser, p. 2)

  y. "Patients desiring a <u>fresh</u>, <u>second opinion</u> about whether their cancer can be successfully treated should contact our physicians directly or send in their films for review and analysis at our Body Radiosurgery Conference." (Exhibit "2," p. 14)

  z. "Many patients with cancers who cannot be treated successfully using standard therapy, or those with cancers that have recurred despite standard chemotherapy, surgery or radiation may wish to inquire about Body Radiosurgery. Also those wishing this innovative therapy as boost radiation dose (after standard radiation) to increase chances of local control and overall success should be motivated to investigate Body Radiosurgery by contacting our physicians at SIUH..." (Exhibit "2," p. 14)

  aa. "The attractiveness of this non-invasive technique is that it can be used when surgery, standard radiation and chemotherapy are not viable options, or have not produced the desired results." (Exhibit "2," p. 2)

  bb. "...radiation will be much better tolerated with outcomes superior to standard radiation." (Exhibit "2," p. 6)

  cc. "Body Radiosurgery offers a second or third chance for many patients -- especially when there are limited sites of the disease." (Exhibit "2," p. 4)

  dd. "Since higher radiation doses can be given, fewer treatments are necessary compared to standard external beam radiation, yet results are superior. . ." Since normal healthy structures are shielded, higher doses of radiation can be delivered to the cancer with the anticipation of greater success." (Exhibit "2," p. 4)

  ee. "We have seen quick and dramatic shrinkage of many patient's lung cancers." (Exhibit "2," p. 11)

  ff. "Lung metastases are cancer nodules that have spread to the lung from other primary sites. ...The local control rate remains well in excess of 90 percent." (Exhibit "2," p. 11)

  gg. "Many patients come to us with severe lung disease not felt to be candidates for standard surgery or radiation, and yet are followed after radiosurgery with good success observed, most commonly." (Exhibit "2," p. 11)

hh.    "The control rate of primary liver tumors is equal – over 90% -- to the success in other areas of Body Radiosurgery."  (Exhibit "2," p. 10)

ii.    "In general, as post-treatment benefit is carried over further months and years, the likelihood of greater shrinkage increases greatly." (Exhibit "2," p. 13)

jj.    "Dr. Kornhauser: What has been the reception from other specialists in the field?

Dr. Lederman: In general, surgeons, medical oncologists and others are excited about having an effective treatment option available for their patients. There have been many situations where no effective therapy could be administered or the presently-available therapy was good but not adequate. Physicians obviously want the best possible outcome for their patient." (Exhibit "9," Lederman-Kornhauser, p. 4)

### Dissemination of False Claims of Success by Patient Testimonials In Violation of New York State Education Law 6530 (27)

133.    Defendants SIUH and Lederman disseminated in their multimedia marketing kit video patient testimonials asserting treatment success with minimal side effects from patients Noel Weiss, his wife and patient Holly Berkowitz, thereby committing professional misconduct in violation of New York Education Law Section 6530 (27) a.iii which prohibits the dissemination to the public of patient testimonials.

134.    Lederman states on the video (Exhibit "5") regarding defendant SIUH and Lederman patient Noel Weiss:

" …liver metastases that had spread and grown despite chemotherapy. He was felt to be an inoperable case and was hopeless before he met us at SIUH. Since undergoing treatments his tumors have stopped growing and he has remained healthy, gained eight pounds and returned to his normal, vibrant outlook of life.

…Lederman:  'So it has been two months since your treatment and what's happened since then?'

Noel Weiss:  'More energy, great outlook.  I walked into a cemetery and I found the exit Mardi Gras.'

Lederman:  'How does Body Radiosurgery compare to chemotherapy?'

**Weiss:** 'There is no comparison.'

**Lederman:** 'How so?'

**Weiss:** 'Well, I would say that chemotherapy is like doing 150 feet bungi jump without the bungi, and Body Radiosurgery is like having a pleasant dream.'

**Lederman: Showing CT Scan of Noel Weiss:** 'He had had extensive chemotherapy and despite chemotherapy his tumor had continued to grow. He had been seen by surgeons who felt this was an inoperable lesion. Therefore he was sent home with no good treatment choices. He underwent Body Radiosurgery and at follow-up his tumor has shown cessation of growth. It had grown prior to radiosurgery and despite chemotherapy. So he has gained about 8 pounds in weight. He is fully functional, no limitations and carrying on a normal life and is very optimistic about the future.'

**Mrs. Weiss:** 'Don't be afraid to go through it. Not painful and we feel it worked.'

**Lederman:** 'This new treatment is non-invasive, highly successful and offers great hope to those who previously thought there was none.'

**Anchorwoman for NY1 on Video:** 'Dr. Lederman is the first physician in the United States to practice body radiosurgery. He says thousands of patients have walked through this door and the results have been nothing short of amazing. And Dr. Lederman says there is a 90% success rate.'" (Exhibit "5")

135.     Defendants SIUH and Lederman failed to reveal to plaintiff, decedent and their children, and others who viewed their testimonial video that Noel Weiss died on or about July 15, 1997, shortly after appearing on the testimonial video.

136.     Each of these aforementioned statements contained in paragraphs "132" and "134" which were relied upon by plaintiffs, contain material misrepresentations of fact and material omissions of fact.

137.     These aforementioned representations, including those contained in paragraphs "132" and "134" imply and implied to a reasonable consumer, including plaintiffs, that defendants SIUH and Lederman with Body Radiosurgery can:

(a)     Cure cancer, including pancreatic cancer and liver metastases;

(b)     Prolong life for patients suffering from many forms of cancer, including

pancreatic cancer and liver metastases;

(c)     Provide a higher quality of life for patients suffering from many forms of

cancer, including pancreatic cancer and liver metastases; and

(d)     Provide a better outcome with a higher quality of life and greater length of

life than other methods commonly provide for patients suffering from

many forms of cancer, including pancreatic cancer and liver metastases.

138.    Defendants SIUH and Lederman did not possess and rely upon any

reasonable basis to substantiate the representations set forth in paragraphs "132," "134"

and "137" at the time the representations were made.

## False Claims of Minimal Side Effects

139.    Defendants SIUH and Lederman expressly represented by the following

statements, when read individually or collectively, that Body Radiosurgery has minimal

side effects and compares favorably to other treatment modalities for cancer, including

pancreatic cancer and liver metastases:

    **a.      "Body Radiosurgery is totally non-intrusive, certainly less toxic, and consumes much less time than other competing modalities of treatment for those selected candidates ... Body Radiosurgery patients generally are able to immediately continue their normal activities." (Exhibit "2," p.7)**

    **b.      "... it's a very high success rate and avoids the invasion of surgery and the toxicity of systemic chemotherapy for many patients."  (Exhibit "5")**

    **c.      "One important aspect of Body Radiosurgery is that it is much quicker overall than standard external beam radiation, chemotherapy, or surgery and their associated convalescence period." (Exhibit "2," p. 7)**

    **d.      "Body Radiosurgery often compares very favorably to chemotherapy, surgery or even standard radiation. Body Radiosurgery is totally non-intrusive, certainly less toxic, and consumes much less time than other competing modalities of treatment for those selected candidates. (Exhibit "2," p. 7)**

e.      **Body Radiosurgery is performed as outpatient therapy. Compared to surgery, there is avoidance of anesthesia, operative risks, as well as hospitalization and convalescence. Body Radiosurgery patients generally are able to immediately continue their activities. (Exhibit "2," p. 7)**

f.      **"The attractiveness of this non-invasive technique is that it can be used when surgery, standard radiation and chemotherapy are not viable options, or have not produced the desired results." (Exhibit "2," p. 2)**

g.      **"...radiation will be much better tolerated with outcomes superior to standard radiation." (Exhibit "2," p. 6)**

h.      **"The appeal of radiosurgery is that very high doses of radiation are precisely delivered with minimal effects to normal healthy tissues."  (Exhibit "2," p. 14)**

140.    These aforementioned statements contained in paragraph "139", which were relied upon by plaintiffs, contain material misrepresentations of fact and material omissions of fact.

141.    These aforementioned representations, including those contained in paragraphs "132," "134" and "139" imply and implied to a reasonable consumer, including plaintiffs, that the Body Radiosurgery employed by defendants SIUH and Lederman:

(a)     Has minimal side effects when used to treat many forms of cancer, including pancreatic cancer and liver metastases;

(b)     Is preferable to surgery or chemotherapy in the treatment of many forms of cancer, including pancreatic cancer and liver metastases since it has fewer side effects than each of these treatment modalities;

(c)     Compares favorably to surgery or chemotherapy in treating many forms of cancer, including pancreatic cancer and liver metastases; and

(d)     Is safe, having been subjected to appropriate scientific study.

142.    Defendants SIUH and Lederman did not possess and rely upon any reasonable basis to substantiate the representations set forth in paragraphs "139" and "141" at the time the representations were made.

### False Claims of Expertise

143.    Defendants SIUH and Lederman expressly represented by the following statements, when read individually or collectively, that SIUH and Lederman have the greatest expertise in treating cancer with Body Radiosurgery and their well-trained and experienced physicians who are involved in the treatment process determine the best treatment options for the patient:

> **"We believe our staff has the greatest experience in the western hemisphere and probably worldwide...**
>
> **Since Body Radiosurgery is so revolutionary, our experts are best informed about the usefulness of this new technology for you or your loved one. (Exhibit "2," p. 15)**
>
> **"Dr. Kornhauser:  I understand you have continued to produce a revolutionary change in the world of stereotactic radiosurgery.**
>
> **Dr. Lederman:  Correct:  We are the first and currently the only hospital in this hemisphere performing stereotactic Body Radiosurgery." (Exhibit "9," Lederman-Kornhauser, p.1)**
>
> **"Talented, well trained, well-experienced personnel, including physicians . . . are involved in the Body Radiosurgery treatment process at our hospital." (Exhibit "2," p. 5)**
>
> **"How is Body Radiosurgery performed?  . . . Indeed, more than 10,000 stereotactic radiosurgery procedures have been performed at SIUH over many years."  (Exhibit "2," p. 5)**
>
> **"Dr. Kornhauser:  How selective are you in the review process?**
>
> **Dr. Lederman: We are quite selective. If we believe other methods of treatment are superior, the patient and family are certainly notified of that. If there are equivalent options or in fact other options, the family and patient are fully informed as to these options."  (Exhibit "9," Lederman-Korhnauser, p. 1)**

Each week our Body Radiosurgery Conference meets to review candidates for Body Radiosurgery as well as previously treated Body Radiosurgery patients who send in new films for review. There, the multi-disciplinary team reviews each patient's case and determines the best treatment method. (Exhibit "2," p. 14)

"Our purpose is to provide the best possible patient care."  (Exhibit "1," p. 9)

Lederman states on video:  "If we believe that other treatment options are superior to this (Body Radiosurgery) we advise the patient of that." (Exhibit "5")

"Our goal is to bridge gaps in the field of radiation as well as other oncologic specialties while using the best of all."  (Exhibit "1," p. 3)

"State of the art technology might offer a beneficial chance when none are evident elsewhere."  (Exhibit "1," p. 11)

"Our armamentarium of radiosurgery technology ensures patients get what is best for them and their disease – not what another hospital's limited resources may restrict." (Exhibit "1," p. 7)

"Our multidisciplinary conferences allows us to review the candidacy of patients even before patients need to set foot in our department. We believe the medical meetings are an important step to help direct patients for best care and to avoid unnecessary and possibly timely and costly travel when we believe there may be better options available."(Exhibit "1," p. 9)

"SIUH is the home of the Journal of Radiosurgery – the only peer-reviewed medical journal dedicated to the field of radiosurgery. The editor is Gil Lederman, M.D. director of Radiation Oncology at SIUH and co-editor, Ehud Arbit, M.D., director of Neurosurgical Oncology at SIUH.

The *Journal of Radiosurgery* –the only medical journal devoted to the field of radiosurgery—is an internationally known peer-reviewed publication with a board of 165 physician researchers." (Exhibit "1," p. 10)

"For a fresh, second opinion consider calling the experts in Radiation Oncology at Staten Island University Hospital. Their expertise is vast." (Exhibit "1," p. 11)

"Who can compare? None, we believe, favorably at this level." (Exhibit "1," p. 8)

Lederman:  "The best chance for a patient is to call us."  (Exhibit "9," Lederman-Kornhauser. p. 6)

"It is a technique (Body Radiosurgery) which we are most comfortable and perform repeatedly every day and every night for patients who come from around the country and throughout the world." (Exhibit "2," p. 6)

144.   These aforementioned statements contained in paragraph "143" which were relied upon by plaintiffs, contain material misrepresentations of fact and material omissions of fact.

145.   These aforementioned representations, including those contained in paragraphs "132," "134," "139" and "143" imply and implied to a reasonable consumer, including plaintiffs, that defendants SIUH and Lederman:

(a) Have the greatest experience and expertise in the western hemisphere and possibly worldwide in treating many forms of cancer, including pancreatic cancer and liver metastases with the revolutionary treatment Body Radiosurgery;

(b) Utilize physicians to treat their patients who are experts in Radiation Oncology, demonstrating a high level of expertise and training in the diagnoses and treatment of many forms of cancer, including pancreatic cancer and liver metastases;

(c) Provide the best treatment option for the patient suffering from many forms of cancer, including, pancreatic cancer and liver metastases;

(d) Evaluate patients suffering from many forms of cancer, including pancreatic cancer and liver metastases with a multidisciplinary team of experts to determine the best treatment options and whether they are qualified to be treated by defendants;

(e) Provide revolutionary cutting edge treatment in a world famous university hospital which is home to a leading peer reviewed medical journal edited by outstanding physicians;

(f) Act in the patient's best interest to provide the best possible care and treatment to the patient suffering from many forms of cancer, including pancreatic cancer and liver metastases; and

(g) Are recognized in the fields of oncology and radiation oncology for their expertise in Body Radiosurgery treatment of many forms of cancer, including pancreatic cancer and liver metastases.

146.    Defendants SIUH and Lederman did not possess and rely upon any reasonable basis to substantiate the representations set forth in paragraphs "143" and "145" at the time the representations were made.

147.    Defendants failed to reveal to plaintiffs and the general public that at or about the time decedent was evaluated and treated by defendants, the Department of Radiation Oncology at SIUH consisted of only three (3) physicians, defendants Lederman, Silverman and Irina Grossman, M.D. ("Grossman")

148.    At the time defendant Silverman, directly performed the evaluation, assessment, treatment plan and treatment of decedent by Radiosurgery and whole liver radiation Silverman was not recognized in the medical field as an oncologist or radiation oncologist since he lacked certification and Diplomate status in either specialty.

149.    Defendant Silverman lacked certification from the American Board of Radiology in Radiation Oncology, the governing body in the medical field he was practicing in at the time he treated decedent.

150.    Defendant Silverman lacked the minimal qualification, certification in Radiation Oncology, recognized in the medical field of Radiation Oncology signifying specialization and minimal competence.

151.    Grossman, who treated decedent, as well, was a foreign medical graduate who became certified by the American Board of Radiology with a Sub-Specialty in Radiation Oncology, on or about 1999.

152.    Defendants failed to reveal to plaintiff and decedent, and the general public, that the *Journal of Radiosurgery* began publication in March 1998 and published its last issue in December 2000 having ceased official publication over one year prior to the dissemination of defendants' SIUH and Lederman representations to plaintiffs and their children.

153.    Defendants further failed to reveal that the co-editor of the *Journal of Radiosurgery,* Ehud Arbit, M.D. ("Arbit") had been disciplined for professional misconduct by New York State Department of Health (OPMC) on two occasions, for among other things, gross negligence, including twice operating on the wrong side of his patients' brain.

154.    The State Department of Health in 2000 found forty (40) violations against SIUH in connection with Arbit's neurosurgery and the failure of SIUH to monitor and discipline him and fined SIUH Eighty Thousand ($80,000) Dollars.

155.    Arbit's license to practice medicine and surgery in the State of New York was suspended from February 18, 2000 through January 5, 2001, with probation for three years and the requirement that he only practice surgery in a New York State Public Health Article 28 facility with a practice monitor during the probation period.

## False Claims of Data Collection and Scientific Research

156.    Defendants SIUH and Lederman expressly represented by the following statements, when read individually or collectively, that there is data, and on-going

39

scientific research within and outside SIUH supporting their representations of the

success and efficacy of Body Radiosurgery in treating many forms of cancer, including

pancreatic cancer and liver metastases:

      a.    "**Our radiosurgery work continues to be evaluated and updated by our research group and our current results are presented at national and international meetings as well as published in major medical journals.**" **(Exhibit "2," p. 16)**

      b.    "**We update our data regularly and track each case to have a complete record of Body Radiosurgery. This is important for our academic work and for patients and their families to be able to possess as much information as possible before making such a crucial decision about one's medical care. "(Exhibit "2," p. 14)**

      c.    "**Studies have shown the effectiveness of Body Radiosurgery in treating both primary as well as metastases.**" **(Exhibit "2," p. 14)**

      d.    "**Our purpose is to provide the best possible patient care.**

**To achieve this, the outcome of our patients must be known and our data be presented at national and international medical meetings. Indeed, a separate division of data management at SIUH Oncology Department is dedicated exactly to these goals. Our patients' results are tracked and updated on a routine basis.**" **(Exhibit "1," p. 9)**

      e.    "**Our patients' results are tracked and updated on a routine basis. It is this data that allows our physicians to present and publish current results at medical forums and in medical literature. "(Exhibit "1," p. 9)**

      f.    "**Data collected with thousands of procedures being performed, continue to show marked efficacy for treating primary and metastatic tumors.**" **(Exhibit "2," p. 2)**

      g.    **Dr. Kornhauser:  "How do you follow patients' progress?**

**Lederman:  "We ask for follow-up CT scans on a regular basis – approximately every three months after the procedure for the first year, and less frequently in subsequent years."  (Exhibit "9," Lederman-Kornhauser, p. 4)**

      h.    **Dr. Kornhauser:  "What are your statistics at SIUH for body radiosurgery?"**

**Lederman:  "Thus far, all tumors treated have been successfully controlled – meaning cessation of growth, shrinkage or disappearance."  (Exhibit "9," Lederman-Kornhauser, p. 5)**

157.   These aforementioned statements, including those contained in paragraph "156," which were relied upon by plaintiffs, contain material misrepresentations of fact and material omissions of fact.

158.   These aforementioned representations, including those contained in paragraphs "132," "134," "139," "143" and "156," imply and implied to a reasonable consumer, including plaintiffs, that defendants SIUH and Lederman:

(a) Collect data carefully and in conformity to generally accepted principles and procedures in medicine and oncology in order to determine the success of and demonstrated the success of Body Radiosurgery treatment for many forms of cancer, including pancreatic cancer and liver metastases;

(b) Collect and interpret data which supports defendants representations that Body Radiosurgery treatment of many forms of cancer, including pancreatic cancer and liver metastases is successful and safe;

(c) Relies on research in the professional community of oncology and performs research based upon generally accepted scientific methods to justify Body Radiosurgery treatment for many forms of cancer, including pancreatic cancer and liver metastases; and

(d) Have published in peer reviewed journals research supporting the success of Body Radiosurgery for many forms of cancer, including pancreatic cancer and liver metastases.

159.   Defendants SIUH and Lederman did not possess and rely upon any reasonable basis to substantiate the representations set forth in paragraphs "156" and "158" at the time the representations were made.

160.   Defendants SIUH and Lederman in their multi-media marketing kit repeatedly disseminated statistics, data, and purported studies allegedly demonstrating successful treatment of many forms of cancer, including pancreatic cancer and liver metastases which were false, misleading and deceptive.

161.   Unknown to plaintiffs and the general public, defendants representations allegedly derived from their scientific research, statistics and data, consisted of materially false representations and material omissions of fact.

162.   Defendants SIUH and Lederman intentionally failed to collect data in a manner generally accepted in the professional community of oncology and medicine and science, nor in conformity with generally accepted principles in oncology, medicine and science.

163.   Defendants SIUH and Lederman intentionally failed to treat the data collected in a manner generally accepted by the professional community of oncology and medicine and science, nor in conformity with generally accepted principles in oncology, medicine and science.

164.   Defendants SIUH and Lederman intentionally analyzed, generalized and interpreted the data they collected in a manner not generally accepted in the professional community of oncology, medicine and science, nor in conformity with generally accepted principles in oncology, medicine and science.

**False Claims of Informed Consent, Patient  Education and Advocacy**

165.   Defendants SIUH and Lederman expressly represented by the following statements, when read individually or collectively, that they would provide sufficient educational information to cancer patients and their families so that they could make an

42

informed choice about treatment options for many forms of cancer, including pancreatic

cancer and liver metastases:

     **a)**    **"If a patient is felt to be an appropriate candidate and wishes to proceed, the informed consent process is continued, fully explaining all risks, benefits and alternatives." (Exhibit "2," p. 14)**

     **b)**    **"We update our data regularly and track each case to have a complete record of Body Radiosurgery. This is important for our academic work and for patients and their families to be able to possess as much information as possible before making such a crucial decision about one's medical care." (Exhibit "2," p. 14)**

     **c)**    **"While some might be critical of our patient advocacy and education programs through the media, we believe they are an important source of patient empowerment – allowing patients and their loved ones to learn more about treatment options before making the crucial decision about one's health, survival and quality of life. Education can be construed only as a positive point." (Exhibit "1," p. 5-6)**

     **d)**    **"The patient and family decide on the best after the informed consent process when all risks, benefits and alternatives are explained and all questions answered." (Exhibit "1," p. 4)**

     **e)**    **Lederman states on video: "If we believe that there are treatment options superior to this (Body Radiosurgery), we advise the patient of that. If we believe that this (Body Radiosurgery) is a viable option, we advise the patient of that. Before any procedure, all risks, benefits and alternatives are fully explained." (Exhibit "5")**

    166.    These aforementioned statements, including those in paragraph "165,"

which were relied upon by plaintiffs, contain material misrepresentations of fact and

material omissions of fact.

    167.    These aforementioned representations, including those contained in

paragraph "165," imply and implied to a reasonable consumer, including plaintiffs, that

defendants SIUH and Lederman:

    (a) Fully explain all risks, benefits and alternatives to their proposed and

        continuing treatment;

(b) Advocate for patients and provide educational programs in the media to enable patients to make informed decisions about their treatment options, health, survival and quality of life;

(c) Other physicians and health care providers are critical of defendants because defendants provide honest information to patients and their families to enable them to make informed treatment decisions; and

(d) Act in the best interests of patients and their families, including their right of self-determination.

168.   Defendants SIUH and Lederman did not possess and rely upon any reasonable basis to substantiate the representations set forth in paragraphs "165" and "167" at the time the representations were made.

## Violation of New York State G.B.L. 349 and 350

169.   That the making and dissemination of the representations by defendants to plaintiffs and their family, as well as other consumers in New York State, contained in Exhibits "1" through "5" and "9," and including the representational examples contained in paragraphs "132," "134," "139," "143," "156" and "165," constitute deceptive business practices and acts and false advertising in violation of New York State General Business Law Sections 349 and 350.

170.   Through their aforementioned conduct, defendants SIUH, Lederman and Silverman aided and abetted one another and violated N.Y.S. General Business Law Sections 349 and 350.

171.   Defendants SIUH, Lederman and Silverman were unjustly enriched as a result of their aforementioned deceptive business practices and acts, and false advertising.

172.    Plaintiff's decedent was injured and sustained damages as a result of defendants' deceptive business practices, acts and false advertising, including, but not limited to:  halting and forgoing chemotherapy treatment which decedent was responding to; loss of the opportunity to obtain treatment which had a probability of prolonging his life; loss of the opportunity to obtain systematic palliative care; loss of the opportunity to receive necessary and appropriate treatment and care; leaving his home, friends and support network in Florida; financial loss and harm; the cost of the treatment at SIUH; pain and suffering;  psychological damages; loss of enjoyment of life; undergoing unnecessary and unsuccessful treatment which caused pain and suffering; aggravation and exacerbation of cancer pain and suffering; aggravation and exacerbation of fatigue, weakness, loss of appetite; aggravation and exacerbation of depression; diminished quality of life; loss of the opportunity to have a better quality of life in the time remaining to decedent; shortening of his remaining life span; loss of the opportunity to choose how to spend his final months of life and the choice of where and how to die.

173.    Plaintiff was injured and sustained damages as a result of defendants' deceptive business practices, acts and false advertising, including, but not limited to leaving her home, friends and support network in Florida; financial loss and harm; loss of employment and income; pain and suffering; psychological damages; loss of enjoyment of life; loss of the opportunity to choose how to live her final months with her husband.

174.    Plaintiff seeks to recover compensatory damages for the injuries sustained by plaintiff's decedent as a result of defendants' deceptive business practices, acts and false advertising.

45

175.   Plaintiff seeks to recover compensatory damages for the injuries she sustained as a result of defendants' deceptive business practices, acts and false advertising.

176.   Plaintiff seeks to recover punitive damages and reasonable attorneys fees and costs as a result of defendants' deceptive business practices, acts and false advertising pursuant to N.Y.S. G.B.L. Sections 349 and 350.

### AS AND FOR A SECOND CAUSE OF ACTION
### <u>AGAINST DEFENDANTS</u>
#### (Fraud)

177.   Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1-176 as if set forth fully herein.

178.   Defendants SIUH, Lederman and Silverman entered into a scheme, on or about 1997, at Staten Island, New York, continuingthrough at least 2002, in order to enrich themselves at the expense of cancer patients and their families, and other health care providers.

179.   In furtherance of their scheme, defendants SIUH, Lederman and Silverman utilized their positions and status as a hospital and physicians providing healthcare to the public, who were legally, ethically and morally obligated to act in the best interests of their patients.

180.   In furtherance of the scheme defendants SIUH, Lederman and Silverman, individually and acting in concert from on or about 1997 continuing through at least 2002, intentionally deceived cancer patients and their families, including decedent and plaintiff, regarding the nature, benefits, risks and alternatives to cancer treatment by Body Radiosurgery, and their expertise as health care providers, in order to lure and induce cancer patients to undergo Body Radiosurgery at SIUH.

181.   In furtherance of the scheme, defendants SIUH, Lederman and Silverman, individually and acting in concert, intentionally created and disseminated or caused to be created and disseminated from New York State to cancer patients and their families within and outside New York State, including plaintiff and decedent, the aforementioned false, deceptive and misleading representations, including that Body Radiosurgery was a "successful" treatment for many forms of cancer, including pancreatic cancer and liver metastases.

182.   Defendants aided and abetted each other in furtherance of their scheme by having intentionally created and disseminated or caused to be created and disseminated from New York State to cancer patients and their families within and outside New York State, including plaintiff and decedent, the aforementioned false, deceptive and misleading representations.

183.   Defendants knew the representations they disseminated were false, misleading and deceptive, containing materially false statements and omitting material information, having been intentionally designed by or on behalf of defendants to lure vulnerable cancer patients and their families into Body Radiosurgery treatment at SIUH.

184.   In furtherance of their scheme, defendants utilized the U.S Postal Service, the Internet, radio advertising, other mass media, consultations and seminars to intentionally disseminate to cancer patients and their families, including plaintiff and decedent, false, misleading and deceptive representations, including their claimed "successful" cancer treatments by Body Radiosurgery with minimal side effects, and their expertise.

185. In furtherance of their scheme, Thomas Ryan Jr. was intentionally lured into a consultation with defendants Silverman, SIUH and Lederman in order to induce decedent to undergo Body Radiosurgery.

186. In furtherance of the scheme Silverman, SIUH and Lederman intentionally disseminated false, misleading and deceptive information to Thomas Ryan Jr. with the intent of deceiving decedent's son and inducing decedent to undergo Body Radiosurgery so that defendants could be unjustly enriched.

187. As a result of defendants' intentional dissemination of the aforementioned false, deceptive and misleading representations, numerous cancer patients and their families, including plaintiff and decedent, relied on defendants' representations since they appeared to be based in fact and the disseminator of the claims of "successful" cancer treatment with minimal side effects were a hospital and physicians who were legally, ethically and morally obligated to act in the best interests of their patients.

188. As a result of defendants' intentional dissemination of the aforementioned false, deceptive and misleading representations, numerous cancer patients and their families, including plaintiff and decedent, were deceived by defendants.

189. As a result of defendants' aforementioned intentional conduct causing them to be deceived, numerous cancer patients and their families, including plaintiff and decedent, were intentionally lured by defendants to SIUH for Body Radiosurgery and had the treatment.

190. That plaintiff and plaintiffs' decedent had no knowledge of the falsity of defendants' representations and relied upon defendants' aforementioned representations believing the representations were true and defendants were truthful.

191.    Defendants intentionally administered Body Radiosurgery to decedent for his pancreatic cancer knowing that their treatment of decedent was not medically justified.

192.    Defendants intentionally administered Body Radiosurgery to decedent for his liver metastases knowing that their treatment of decedent was not medically justified

193.    Defendants intentionally administered Body Radiosurgery and/or whole liver radiation to decedent for his pancreatic cancer with liver metastases knowing that their treatment of decedent was not medically justified

194.    As a result of defendants aforementioned intentional conduct, defendants SIUH, Lederman and Silverman wrongfully received payment for some or all the Body Radiosurgery evaluation, procedures, supplies and treatment in connection with the Body Radiosurgery performed at SIUH on cancer patients, including, plaintiff's decedent.

195.    As a result of defendants' aforementioned intentional conduct, defendants SIUH, Lederman and Silverman were each unjustly enriched at the expense of many cancer patients and their families, including plaintiffs.

196.    Defendants engaged in the aforementioned course of conduct with full knowledge that their intentional dissemination of false, misleading and deceptive representations to cancer patients and their families, including to plaintiffs, regarding their treatment "success" with Body Radiosurgery for many forms of cancer, claims of minimal treatment side effects, claims of expertise, claims of providing a revolutionary treatment having a "better outcome with a higher quality of life and greater length of life than other methods commonly provide" could and would cause injury to cancer patients and their families since reliance upon defendants' representations would cause many

49

patients to forgo appropriate  treatment having a greater probability of prolonging life with a greater quality of life than that achieved with Body Radiosurgery at SIUH.

197.    Defendants engaged in the aforementioned course of conduct with full knowledge that their intentional dissemination of false, misleading and deceptive representations to cancer patients and their families, including to plaintiffs, regarding their treatment "success" with Body Radiosurgery for many forms of cancer with minimal side effects could or would harm terminally ill cancer patients and their families by causing them pain and suffering and depriving them of appropriate care and treatment, including systematic palliative care and the choice how to live their final days together.

198.    Plaintiff's decedent was injured and sustained the following damages as a result of defendants' fraud including, but not limited to: halting chemotherapy treatment which he was responding to; loss of the opportunity to obtain treatment which had a probability of prolonging his life; loss of the opportunity to obtain systematic palliative care; loss of the opportunity to receive necessary and appropriate treatment and care; leaving his home, friends and support network in Florida; financial loss and harm; psychological injury; loss of enjoyment of life; undergoing unnecessary and unsuccessful treatment which caused pain and suffering; aggravation and exacerbation of cancer pain and suffering; fatigue, weakness, loss of appetite; dehydration; aggravation and exacerbation of fatigue, weakness, loss of appetite; dehydration; aggravation and exacerbation of depression; diminished quality of life; loss of the opportunity to have a better quality of life in the time remaining to decedent; shortening of decedent's remaining life span, loss of the opportunity to choose how to live his final months of life; and loss of the choice of where and how to die.

199.    Plaintiff was injured and sustained damages as a result of defendants' fraud, including, but not limited to leaving her home, friends and support network in Florida; financial loss and harm; loss of employment and income; pain and suffering; psychological injury; loss of enjoyment of life; loss of the opportunity to choose how to live her final months with her husband.

200.    As a result of defendants' intentional conduct, numerous cancer patients and their families were injured and sustained damages in New York State, including, but not limited to, halting or forgoing necessary and appropriate treatment; loss of the opportunity to obtain treatment which had a probability of prolonging life; loss of the opportunity to obtain systematic palliative care; loss of the opportunity to receive necessary and appropriate treatment and care; leaving their homes, family, friends and support to travel to Staten Island New York for treatment at SIUH; financial loss and harm; psychological damages; loss of enjoyment of life; undergoing unnecessary and unsuccessful treatment which caused pain and suffering; aggravation and exacerbation of cancer pain and suffering; aggravation and exacerbation of fatigue, weakness, loss of appetite; aggravation and exacerbation of depression; loss of the opportunity to choose how to live the final months of life.

201.    Plaintiff seeks to recover compensatory damages for the injuries sustained by plaintiff's decedent as a result of defendants' fraud.

202.    Plaintiff seeks to recover compensatory damages for the injuries she sustained as a result of defendants' fraud.

## STATEMENT AS TO PUNITIVE DAMAGES

203.    The intentional conduct by defendants SIUH, Lederman and Silverman was morally culpable and grossly wanton, manifesting a conscious disregard for the rights of others, the general public and in particular, the rights of vulnerable cancer patients and their families. Defendants' intentional conduct was directed at the public, and in particular at vulnerable, desperate cancer patients and their families, in whose best interests, defendants were legally, ethically and morally required to act. Defendants' intentional conduct caused plaintiff's decedent and plaintiff grievous harm. Plaintiff demands punitive damages in an amount sufficient to punish defendants and deter other prospective wrongdoers.

204.    Plaintiff seeks to recover attorneys' fees and costs as a result of defendants' fraud.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST DEFENDANTS
### (Lack of Informed Consent: N.Y.S. Public Health Law Sec. 2805-d)

205.    Plaintiff hereby repeats and realleges the allegations contained in paragraphs 1 through 204 as if set forth fully herein.

206.    Defendants SIUH, Lederman and Silverman carelessly, negligently, grossly negligently, recklessly and/or intentionally failed to disclose to plaintiff's decedent the reasonably foreseeable benefits, risks and alternatives, including the probabilities of occurrence, to the treatment they provided, including Body Radiosurgery to the pancreas, Body Radiosurgery to the liver and whole liver radiation.

207.    Defendants SIUH, Lederman and Silverman carelessly, negligently, grossly negligently, recklessly and/or intentionally failed to disclose to plaintiff's

decedent the reasonable benefits, risks and alternatives to their treatment, and their probability of occurrence, as a reasonable physician under the circumstances would have disclosed, in a manner permitting plaintiff's decedent to make an informed choice and knowledgeable evaluation of his treatment options and whether to consent to the treatment offered by defendants.

208.    Defendants carelessly, negligently, grossly negligently, recklessly and/or intentionally failed to disclose that their Body Radiosurgery treatment for pancreatic cancer was not the standard of care in the fields of oncology and medicine for pancreatic cancer and was investigational.

209.    Defendants carelessly, negligently, grossly negligently, recklessly and/or intentionally failed to disclose that their Body Radiosurgery treatment for liver metastases was not the standard of care in the fields of oncology and medicine for liver metastases and was investigational.

210.    Defendants carelessly, negligently, grossly negligently, recklessly and/or intentionally failed to disclose that their Body Radiosurgery treatment for pancreatic cancer with liver metastases was not the standard of care in oncology and medicine and was investigational

211.    Neither plaintiff's decedent nor a reasonably prudent person in plaintiff's decedent's position would have undergone the treatment, including, Body Radiosurgery to the pancreas, Body Radiosurgery to the liver and whole liver radiation if plaintiff's decedent had been fully informed by defendants.

212.    Since plaintiff's decedent relied upon the aforementioned false, misleading and deceptive representations disseminated by defendants to plaintiff's

decedent, plaintiff and their children regarding the nature, benefits, risks and alternatives to the treatment at SIUH, plaintiff's decedent could not and did not make an informed consent to the treatment provided by defendants.

213.    The lack of informed consent is a proximate cause of the injuries and damages sustained by plaintiff's decedent, including, severe pain and suffering; loss of the opportunity to obtain treatment which had a probability of prolonging his life; loss of the opportunity to obtain systematic palliative care; loss of the opportunity to receive necessary and appropriate care; undergoing unnecessary and unsuccessful treatment which caused pain and suffering; aggravation and exacerbation of cancer related pain and suffering; fatigue, weakness, loss of appetite, dehydration; aggravation and exacerbation of fatigue, weakness, loss of appetite; aggravation and exacerbation of depression; decreased quality of life; loss of the opportunity to prolong his life and have a better quality of life in the time remaining decedent; loss of the right to make an informed decision as to what treatments, if any, decedent should undergo.

214.    Plaintiff seeks to recover compensatory damages for the injuries sustained by plaintiff's decedent as a result of defendants' failure to disclose to plaintiff's decedent the reasonable benefits, risks and alternatives to their treatment, as set forth herein.

215.    Plaintiff seeks to recover punitive damages for the injuries sustained by plaintiff's decedent as a result of defendants' failure to disclose to plaintiff's decedent the reasonable benefits, risks and alternatives to their treatment, as set forth herein.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST DEFENDANTS
### (Medical Negligence)

216.    Plaintiffs hereby repeats and realleges the allegations contained in paragraphs 1 through 215 as if set forth fully herein.

217.   Defendant SIUH, and its agents, servants and/or employees were negligent, careless and reckless in their failure to provide proper medical care, treatment, diagnoses, and assistance to plaintiff's decedent.

218.   Defendant Lederman, and his agents, servants and/or employees were careless, negligent, grossly negligent and/or reckless in their failure to provide proper medical care, treatment, diagnoses, and assistance to plaintiff's decedent.

219.   Defendant Silverman and his agents, servants and/or employees were careless, negligent, grossly negligent and/or reckless in their failure to provide proper medical care, treatment, diagnoses, and assistance to plaintiff's decedent.

220.   As a result of the negligence, carelessness and recklessness of each of the defendants and their agents, servants and/or employees, as set forth herein, plaintiff's decedent suffered severe injuries, including pain; loss of the opportunity to obtain treatment which had a probability of prolonging his life; loss of the opportunity to obtain systematic palliative care; loss of the opportunity to receive necessary and appropriate care; undergoing unnecessary, inappropriate and unsuccessful treatment which caused pain and suffering; psychological damages; aggravation and exacerbation of cancer related pain and suffering; fatigue, weakness, loss of appetite, dehydration; bowel problems; physical and psychological deterioration; aggravation and exacerbation of fatigue, weakness, loss of appetite; aggravation and exacerbation of depression; decreased quality of life; decreased length of life.

221.   Plaintiff seeks to recover compensatory damages for the injuries sustained by plaintiff's decedent.

## AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST DEFENDANTS
#### (Loss of Consortium)

222.    Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 221 as if set forth fully herein.

223.    Plaintiff Elizabeth M. Ryan was the wife of decedent Thomas W. Ryan.

224.    As a result of the carelessness, negligence, gross negligence and/or recklessness of defendants SIUH, Lederman and Silverman, plaintiff Elizabeth M. Ryan sustained the loss of services, society, companionship and consortium of Thomas W. Ryan.

225.    As a result of the carelessness, negligence, gross negligence and/or recklessness of defendants, plaintiff was forced to spend money for his care and treatment.

226.    As a result of the foregoing, plaintiff has sustained harm and seeks from defendants SIUH, Lederman and Silverman compensatory damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

a)    On the First Cause of Action, awarding compensatory damages in an amount not less than Ten Million Dollars ($10,000,000) and punitive damages, the exact amount of compensatory and punitive damages to be determined at the trial of this action, as well as attorneys fees and the costs of this action;

(b)    On the Second Cause of Action, awarding compensatory damages in an amount not less than Ten Million Dollars ($10,000,000) and punitive damages, the exact amount of compensatory and punitive damages to be determined at the trial of this action, as well as attorneys fees and the cost of this action;

(c)     On the Third Cause of Action, awarding compensatory damages in an amount not less than Five Million Dollars ($5,000,000) and punitive damages, the exact amount of compensatory and punitive damages to be determined at the trial of this action, as well as attorneys fees and the cost of this action;

(d)     On the Fourth Cause of Action, awarding compensatory damages in an amount not less than Five Million Dollars ($5,000,000), the exact amount of compensatory to be determined at the trial of this action, as well as attorneys fees and the costs of this action;

(e)     On the Fifth Cause of Action, awarding compensatory damages in an amount not less than One Million Dollars ($1,000,000), the exact amount of compensatory damages to be determined at the trial of this action, as well as attorneys' fees and the cost of this action; and

(f)     For such other and further relief as this Court deems equitable and proper.

Dated: New York, New York
       October 23, 2007

LIFFLANDER & REICH LLP

By: _____
      Richard I. Reich (RIR-7522)
      Roman E. Gitnik (REG-4993)
      Attorneys for Plaintiff
      1221 Avenue of the Americas
      New York, New York 10020-1089
      212.332.8820; 8824